Kasey C. Nye, Esq. (AZ#020610)
Elizabeth S. Fella, Esq. (AZ#025236)
QUARLES & BRADY LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621
Telephone: (520) 770-8700
Email: kasey.nye@quarles.com
Email: elizabeth.fella@quarles.com

Proposed Attorneys for Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| TRANSWEST RESORT PROPERTIES, INC., an Arizona corporation, | Case No. 4:10-bk-37134 |
| Debtor. | |
| Joint Administration pending with: | Joint Administration pending with Case Nos.: |
| TRANSWEST TUCSON PROPERTY, L.L.C., a Delaware limited liability company, | 4:10-bk-37160 |
| TRANSWEST HILTON HEAD PROPERTY, LLC, a Delaware limited liability company, | 4:10-bk-37170 |
| TRANSWEST TUCSON II, LLC, a Delaware limited liability company, and | 4:10-bk-37151 |
| TRANSWEST HILTON HEAD II, LLC, a Delaware limited liability company. | 4:10-bk-37145 |
| This Pleading applies to:<br>☑ All Debtors<br>☐ Specified Debtors | **EMERGENCY MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL** |

TRANSWEST RESORT PROPERTIES, INC., TRANSWEST TUCSON PROPERTY, L.L.C., TRANSWEST HILTON HEAD PROPERTY LLC, TRANSWEST TUCSON II, LLC,

QB\11598655.10

and TRANSWEST HILTON HEAD II, LLC (collectively, "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (the "Reorganization Cases"), by and through its attorneys undersigned, respectfully move the Court pursuant to Section 363 of the Bankruptcy Code to enter an Order allowing Debtors to use cash collateral in accordance with the Summary Budget attached hereto as Exhibit "1".

The Debtors, which own two luxury resorts—the Westin La Paloma Resort and Country Club in Tucson, Arizona (the "La Paloma Resort" or "La Paloma"), and the Westin Hilton Head Resort and Spa in Hilton Head, South Carolina (the "Hilton Head Resort," and collectively with La Paloma, the "Resorts")—that are operated by Starwood Hotels and Resorts Worldwide, Inc. ("Westin" or "Starwood"), filed these Reorganization Cases in order to comprehensively reform the Debtors' capital structure through a plan of reorganization that will provide for an immediate multi-million-dollar new capital investment into the Debtors. Although the Resorts generate sufficient cash flow to cover operations, they do not generate sufficient income to justify their present levels of mortgage and mezzanine debt. Further, the Resorts need capital improvements in order to remain competitive in their respective markets. The Debtors believe that a plan of reorganization that will facilitate executing the Debtors' three-year-multimillion-dollar capital improvement plan will enhance the value of the Resorts and increase the return to creditors compared to alternative scenarios which all involve liquidation.

In order to accomplish the contemplated reorganization, the Resorts must be permitted to continue to operate, cover payroll for over 700 Resort employees,[1] to fund and expend reserves for routine repair and replacement issues, and further must address certain capital expenditures in order to remain in compliance with the Westin flag and maintain their four-diamond ratings. The Debtors' mortgage lenders will be adequately protected by the continuing operating profits, by a replacement lien in the receipts generated post-petition, by the new post-petition cash

---

[1] The Resorts personnel are employed by Starwood, not the Debtors. The Debtors reimburse Starwood for the expenses associated with the employees.

-2-

management regime that transparently segregates accumulating cash collateral, and by the improved operating performance of the Resorts that result from the capital expenditures.

This Motion is supported by: (i) the attached Memorandum of Points and Authorities; (ii) the "Declaration of Randal G. Dix" and (iii) the "Declaration of Doris Parker" filed concurrently herewith; and (iv) the entire record before the Court in these Reorganization Cases.

RESPECTFULLY SUBMITTED this 17th day of November, 2010.

QUARLES & BRADY LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621

By */s/ Kasey C. Nye*
    Kasey C. Nye
    Elizabeth S. Fella

Proposed Attorneys for Debtors

QB\11598655.10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND.

### A. Procedural Background.

On November 17 2010 (the "Petition Date"), the Debtors, and certain affiliates, filed voluntary petitions for relief under Chapter 11 of the United States Code (the "Bankruptcy Code") thereby commencing the Reorganization Cases. Since the commencement of their Reorganization Cases, the Debtors have continued to operate their businesses and manage their assets as debtors and debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

This Emergency Motion for Order Authorizing Use of Cash Collateral (the "Motion") presents a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M) over which this Court has jurisdiction to enter a final order pursuant to 28 U.S.C. § 1334.

### B. The Debtors and Their Organizational and Capital Structures.

Transwest Resort Properties, Inc., is a Delaware corporation ("TRP") headquartered in Tucson, Arizona, that owns two luxury resort hotels: the La Paloma Resort and the Hilton Head Resort (the "Resorts"). The Resorts' hospitality operations have over 700 employees and are managed by Starwood, under the luxury brand Westin flag. Prior to the Petition Date, Starwood's operation of the Resorts was supervised by Transwest Properties, Inc. ("Transwest Partners"), a Tucson based real estate development and investment firm that focuses on creating value, improving performance, and maximizing profitability in a wide portfolio of affiliate owned assets including resorts, hotels, multi-family housing, and office and retail properties. In fact, Transwest Partners—which owns and operates the La Posada Lodge & Casitas, the Hampton Inn & Suites Tucson Mall, TownePlace Suites by Marriott, the Embassy Suites at Williams Center, the Doubletree Hotel Tucson at Reid Park, as well as the Peñasco Del Sol Hotel in Puerto Peñasco-Rocky Point, Sonora, Mexico—is one of the largest hotel operators in Southern Arizona.

Pursuant to lender requirements, TRP indirectly owns and manages the Resorts through a series of special purpose entities—Transwest Tucson Property, LLC, and Transwest Hilton Head Property, LLC (collectively the "Property Entities"), directly own and operate the Resorts through a contract with Starwood—with the Tucson entity owning and operating the La Paloma Resort, and the Hilton Head entity owning and operating the Hilton Head Resort. Transwest Tucson II, LLC and Transwest Hilton Head II, LLC (collectively the "Level II Entities") each own 100% of the membership interest in Transwest Tucson Property, LLC, and Transwest Hilton Head Property, LLC, respectively. TRP indirectly owns and controls the Level II Entities and Property Entities through a series of non-debtor entities that have no other business operations. A true and correct copy of the organizational chart for TRP and related entities is attached to the Dix Declaration as Exhibit "A". The Property Entities, TRP, and the Level II Entities have each filed voluntary Chapter 11 petitions and are collectively referred to as the "Debtors" in this Motion.

Transwest Partners acquired TRP and the Resorts in a $270,000,000 leveraged stock purchase transaction that closed on December 5, 2007. Transwest Partners brought $30,000,000 cash to the transaction. The balance of the transaction was accomplished through a $209,000,000 mortgage loan secured by the Resorts (the "Mortgage Loan"), a $21,500,000 mezzanine loan (the "Mezzanine Loan"), and a $10,000,000 junior mezzanine carry-back loan from the seller.

The Mortgage Loan is evidenced by two promissory notes dated December 5, 2007—one note in the original principal amount of $105,000,000 (the "A-1 Note"), and one note in the original principal amount of $104,000,000 (the "A-2 Note," and collectively with the A-1 Note, the "Mortgage Notes")—and executed on behalf of each of the Property Entities as co-makers. The Mortgage Notes are secured by a "Deed of Trust Assignment of Leases and Rents, Security Agreement and Fixture Filing" encumbering the La Paloma Resort that was recorded on December 5, 2007, in the Office of the Pima County Recorder at Docket 13195 and Page 1621 (the "Arizona Deed of Trust"), and by a "Mortgage, Assignment of Leases and Rents, Security

Agreement and Fixture Filing" recorded in the office of the Beaufort County, South Carolina Recorder's Office at Book 02658 and Pages 2310-2337 (the "South Carolina Mortgage").

The original mortgage lender sold the Mortgage Notes into two separate Commercial Mortgage Backed Securities Trusts. Specifically, the A-1 Note is owned by Wells Fargo Bank, NA, as trustee for J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-C1 (the "2007-C1 CMBS Trust"), and the A-2 Note is owned by Bank of America, N.A., as trustee for J.P. Morgan Chase Commercial Mortgage Securities Trust 2008-C2 (the "2008-C2 Trust" and together with 2007-C1 CMBS Trust hereinafter referred to as the "Mortgage Lenders"). Pursuant to an intercreditor agreement, the trustee for the 2007-C1 CMBS Trust is the beneficiary of the Arizona Deed of Trust and the South Carolina Mortgage, and the collateral agent for both Mortgage Lenders. Neither trustee is active in the administration of the Mortgage Loan; instead the Mortgage Loan is administered by a servicer—presently LNR Partners, LLC ("LNR")—which took over special servicing of the Mortgage Loan on June 1, 2010, from Midland Loan Services ("Midland").

### C. The Economic Downturn in the Fall of 2008 Drastically Reduces Business.

The business plan at the time Transwest Partners acquired the Debtors was to raise $110,000,000 through a syndication of the stock in TRP that would have allowed Transwest Partners to recover its out-of-pocket equity contribution, and to put approximately $72,000,000 into capital improvements to enhance the value of the Resorts.[2] As the economy slowed during 2008 while it was preparing the syndication offering, Transwest Partners supplemented the Property Entities' payments on the Mortgage Loan and Mezzanine Loan with over $3 million of additional capital. By the end of September 2008, Transwest Partners could no longer afford to supplement the loan payments. As a result, the Debtors failed to make the mortgage and mezzanine loan payment due October 1, 2008. The crash of the financial markets in September

---

[2] Certain proceeds would have gone to transaction cost with the balance reserved for contingencies.

QB\11598655.10

2008 and the subsequent scandal related to the AIG Executives' $440,000 retreat just one week after receiving a government bail out (the "AIG Effect"), resulted in massive cancellations of corporate business for both Resorts and drastic losses of business in general. The drop in revenue was staggering. In the two years before Transwest Partners acquired the Debtors, the Resorts had combined net operating income after taxes and insurance and FF&E reserves but before debt service, depreciation, and amortization ("Net Operating Income") of $ 17.6 million and $18.0 million. Net Operating Income dropped 21.6% in 2008 to $14.1 million. The financial markets' collapse and the AIG Effect —which only affected the last quarter of 2008—had an even more drastic impact in 2009 when Net Operating Income declined another 59% to $ 5.8 million. The Resorts have suffered even more 2010. In part this has been a result of deferred capital investments affecting individuals and groups willingness to use the Resorts. The La Paloma Resort's performance has also been negatively affected by the loss of over $2 million of lost group business as a result of the controversy surrounding Arizona Senate Bill 1070 regarding illegal immigration. The Resorts' combined Net Operating Income is presently forecasted to be $2.9 million in calendar year 2010. As a result of their drastically reduced income, the Property Entities cannot pay their existing debt service obligations to either the Mortgage Loan ($14.3 million per year) or the Mezzanine Loan ($3 million per year).

**D.     Events Leading to Filing the Reorganization Cases.**

1. The Debtors Default on the Mortgage and Mezzanine Loans.

The Debtors defaulted on the Mortgage Loan and the Mezzanine Loans by failing to make the October 1, 2008 interest payments when due. On November 4, 2008, attorneys for Midland (the original special servicer) and the Mortgage Lenders sent a notice of default to the Property Entities. Thereafter the Debtors entered into discussions with Midland and the Mezzanine Lenders resulting in a series of pre-negotiation letter agreements, forbearance agreements, and cure extensions with the various lenders. Ultimately, the Debtors reached an

QB\11598655.10

informal arrangement with Midland, the special servicer on the Mortgage Loan, pursuant to which they would pay net operating income to the Mortgage Lenders. Since November 2008 the Debtors have paid over $17 million to the lock box controlled by the Mortgage Lenders under this arrangement.

2. <u>Asset Managers Hired</u>.

In order to demonstrate to Midland and the mortgage and mezzanine lenders that everything was managed properly, the Debtors immediately retained an independent third party expert, Creative Hospitality Investment Consultants ("CHIC"), and 30-year hospitality veteran Doris Parker, in particular, to serve as asset manager. Akin to a chief restructuring officer, the asset manager's primary role was to supervise Starwood in its operation of the Resorts and to interact and negotiate with the special servicer regarding budgets and operational restructuring issues. Although the Debtors were happy with CHIC's performance, Midland requested that the Debtors replace CHIC with a less expensive alternative. Midland provided Transwest Partners with a list of three alternative asset managers but made clear that it preferred Manhattan Hospitality Advisers ("MHA"). Based on this preference, the Debtors retained MHA to fulfill the asset manager's role.

MHA was a disaster: it created an unnecessarily acrimonious relationship with the hotel operators (Starwood), conferred with Midland behind Transwest's back, and told Transwest Partners and Starwood one thing while telling Midland the opposite. Further, management believes that MHA's decision-making hurt rather than helped the Resorts' net operating income. In particular, MHA refused to recommend updating the Resorts with new flat screen LCD televisions even though all the competitors had them. This refusal was particularly egregious because the Resorts are the last two Westin-branded hotels in North America to convert to flat screens and because Westin could document over $9 million of lost group business directly resulting from the need to update the guestrooms with modern televisions. The problems with

-8-

QB\11598655.10

MHA coincided with Midland beginning to take steps to seek the appointment of a receiver in Federal Court.

        3.      <u>The Debtors Retained Restructuring Professionals and Began Working to Restructure Their Capital Structure</u>.

As a result of this series of events, the Debtors terminated MHA's contract and began to serve as the asset manager[3] without any compensation for this service. At the same time the Debtors retained bankruptcy and restructuring counsel, Quarles & Brady LLP, and a Las Vegas, Nevada based investment banking firm, Valtus Capital Advisers ("Valtus"), to assist with the Debtors' interactions with the mortgage and mezzanine lenders.

With the assistance of its restructuring advisors, the Debtors made a series of restructuring proposals to the special servicer in an attempt to avoid a receivership/foreclosure or bankruptcy scenario. Each of these restructuring proposals has involved Transwest Partners bringing an immediate multi-million dollar new capital investment to the Property Entities. Eventually Midland backed off from its threats of pursuing a receivership or foreclosure liquidation of the Resorts.

Recapitalizing the Debtors is essential to the Resorts survival as leaders in their respective markets. As described above, the Debtors originally intended to invest $70 million to implement an elaborate capital improvement plan. That plan involved replacing the bathrooms at both Resorts and many other significant updates that are no longer justified in today's economy. Nevertheless, the Resorts need some capital improvements in order to remain competitive as luxury resort destinations. In June 2009 Starwood proposed a $36.2 million Property Improvement Plan for the two Resorts the ("2009 PIP"). However, the current hospitality market dictates a small amount of capital improvements now. In the workout process the Debtors, along

---

[3] Transwest Partners' affiliate business, Premiere Hotel Group, fulfills the asset manager role with respect to the other parts of Transwest Partners' hotel portfolio.

-9-

QB\11598655.10

with its restructuring advisers, revisited the 2009 PIP and developed a more appropriate capital improvement plan with input from the on-site management from Starwood.

Armed with the refined capital improvement plan, together with the assistance of Valtus, and separately through Transwest Partners' traditional capital sources, the Debtors made extensive efforts to raise additional capital to aid in restructuring and facilitate the execution of a much needed capital improvement plan. All of the restructuring proposals that the Debtors made to the Mortgage Lenders have involved funding a reasonable capital improvement plan out of a combination of new capital and revenue from the Resorts.

4. <u>LNR Replaces Midland and Immediately "Goes Dark."</u>

On June 1, 2010, just as the Debtors were starting to make progress with Midland, Midland was replaced as special servicer by LNR. The Debtors have information and therefore believe that LNR became the special servicer as a result of its or an affiliate's acquisition of the controlling certificates in the Mortgage Lenders. The Debtors signed a new pre-negotiation letter with LNR. After an initial flurry of activity at the end of July and August, while it got up to speed, LNR has been completely non-responsive to the Debtors' overtures regarding restructuring the Mortgage Loans.

Although the Debtors obtained strong interest from several investment groups regarding investing new capital in the Resorts along with Transwest Partners—provided that the Mortgage Loan and the rest of the capital structure could be addressed—it became impossible to advance these negotiations when LNR went dark. Without any engagement from the Mortgage Lenders regarding loan size, interest rates, or payment terms, it is impossible to negotiate investment levels or returns with investors.

In addition to refusing to engage in any discussions with the Debtors, LNR has apparently begun its foreclosure and receivership process by ordering a Phase I environmental assessment of the Resorts, and scheduling visits to the Resorts with would-be asset managers or

-10-

QB\11598655.10

receiver firms. Transwest Partners believes that pursuit of liquidation would be disastrous for the Debtors and their creditors.

Transwest Partners had similar experience working with LNR on another distressed hotel project. In 2008 a Transwest Partners owned affiliate defaulted on a $26 million loan that was secured by an Embassy Suites on 44th Street near Sky Harbor Airport in Phoenix. LNR was appointed the special servicer on that loan. Transwest Partners made a restructuring proposal to LNR that would have repaid the entire principal balance after certain temporary interest rate concessions. After Transwest Partners had problems getting any response, LNR rejected the work-out proposal and Transwest Partners agreed to surrender the hotel to a receiver. Immediately after the surrender, both LNR and the receiver went completely dark. As a result of the appointment of a receiver, Hilton immediately canceled the hotel's right to use the Embassy Suites' flag which further devastated its sales. Further LNR's receiver refused to pay numerous legitimate pre-receivership vendors. Ultimately the hotel was forced to close and over 100 jobs were lost. According to published reports, after it completed a trustee's sale and marketing the hotel for nearly a year, LNR recently sold the hotel for around $8.5 million. This result is particularly egregious because Transwest Partners would have been able to preserve the flag relationship and achieve a better result for the entity's creditors.

Every indication is that LNR is pursuing the same stubborn path that is likely to achieve similar results of job losses and huge losses to the bondholders.

5. <u>Problems Exacerbated After LNR's Appointment</u>.

Other problems have arisen since LNR came on the scene and then immediately went dark. Specifically, due to ambiguities in how the clearing account agreement, non-disturbance agreement and loan agreements interact it has become increasingly difficult for Starwood and the Debtors to determine whether certain expenses could be paid out of the operating accounts without obtaining express lender consent. For example as a result of certain

QB\11598655.10

documentation problems, confusion has arisen regarding paying personal property taxes or fund certain letters of credit required by state authorities unless. This confusion has put the Debtors and their creditors in an untenable situation, which, combined with LNR's stubborn pursuit of a liquidation, has forced the Debtors to file these Reorganization Cases.

### E. The Reorganization Cases.

The Debtors filed these Reorganization Cases in order to comprehensively reform their capital structure through a plan of reorganization that will provide for an immediate multi-million dollar new capital investment into the Debtors. The reorganization plan will allow the Debtors to execute their three-year-multimillion-dollar capital improvement plan and will enhance the return not only to the Mortgage Lenders, but also to the Debtors' other creditors. The Reorganization Cases will unfold in three stages:

    1. *Initial Stage*. The first stage of the Reorganization Cases will lay a foundation and set the table so that the remainder of the Reorganization Cases may proceed. During this stage the Debtors will stabilize the Debtors' operations through obtaining final orders authorizing a post-petition cash management system that will resolve problems between the Debtors and Starwood under the pre-petition cash management regime. Based on the familiarity with the Resorts and a new more affordable fee structure, the Debtors have proposed that CHIC be appointed post-petition asset manager to supervise Starwood's operation of the resorts while the Debtors are in Chapter 11. The Debtors post-petition operations will be further stabilized through obtaining a final order authorizing use of cash collateral according to a Court-approved budget that maximizes the enterprise value of the Debtors and benefits the Debtors' Creditors by providing for operation of the Resorts, administration of the bankruptcy estates, and certain limited but necessary capital expenditures. The final and most important component of this initial stage will be obtaining an order determining value of the Resorts which in turn determine the extent of the Mortgage Lenders' secured and unsecured claims under 11 U.S.C. § 506(a).

The Debtors intend to accomplish this first stage within the first 60-90 days after the Petition Date.

  2. *The Plan Negotiation Stage*. During the second stage of the Reorganization Cases, with the Court's ruling on valuation, the Debtors will negotiate with both its creditors and its prospective investment partners, and will propose a plan of reorganization that treats all creditors fairly and facilitates investment into the Resorts. The Debtors intend to complete this stage of the Reorganization Cases during the 60-90 days following completion of the initial stage. If necessary the Debtors may seek an extension of exclusivity in order to complete this stage of the reorganization case.

  3. *The Plan Confirmation Stage*. During the third stage of the Reorganization Cases the Debtors will aggressively prosecute their plan of reorganization to a rapid confirmation. The Debtors anticipate that this stage of the Reorganization Case will last between 75-120 days, and may require extension of the exclusive period provided under 11 U.S.C. § 1121.

  **F.** **The Debtors' Pre-Bankruptcy Cash Management System.**

Resort level cash management is controlled by Starwood which is the sole signatory on the resort level accounts. Specifically, the Hilton Head Resort deposits all of its revenue into an account at Bank of America entitled "Starwood Hotels & Resorts, as Agent for Transwest Hilton Head Property, L.L.C.," which is referred to by Resort management as the "Deposit Account." The Hilton Head Resort also maintains an "Accounts Payable Account" and a "Payroll Account" and a "Villas Accounts Payable Account" at Bank of America. The Hilton Head Resort writes all of its checks to vendors using the Accounts Payable Account which is a zero balance account that automatically draws funds from the Deposit Account. The Villas Accounts Payable Account is used solely to reimburse the owners of beach villas on the Hilton Head Resort's campus if their villa is rented to Resort guests. The Payroll Account is also a zero balance account, but is no

longer used by the Resorts because all payroll functions are handled by Starwood's corporate offices which receive funds from the Deposit Account to fund payroll. Collectively the Deposit Account, the Accounts Payable Account, and the Payroll Account at the Hilton Head Resort will be referred to in this Cash Management Motion as the "Hilton Head Starwood Controlled Operating Accounts."

Similarly, the La Paloma Resort deposits all of its revenue into an account at Bank of America entitled "Starwood Hotels & Resorts, as Agent for Transwest Tucson Property, L.L.C.," which is referred to by Resort management as the "Deposit Account." The La Paloma Resort also maintains an "Accounts Payable Account" at Bank of America. The La Paloma Resort writes all of its checks to vendors using the Accounts Payable Account which is a zero balance account that automatically draws funds from the Deposit Account. All of the credit card machines associated with the Resorts deposit funds into the Deposit Account. Collectively the Deposit Account, and the Accounts Payable Account at the La Paloma Resort will be referred to as the "La Paloma Starwood Controlled Operating Accounts." The Hilton Head Starwood Controlled Operating Accounts and the La Paloma Starwood Controlled Operating Accounts are collectively referred to herein as the "Starwood Controlled Operating Accounts." The Debtors request that the Court enter an order maintaining the existence of the property level bank accounts in order to have the least possible disruption to the operation of the Resorts.

From time to time, both Resorts transfer so-called net revenues into certain clearing accounts which are controlled by the Mortgage Lenders. These transfers to the clearing account fund as series of sub-accounts in the following order of preference/waterfall: 1) Tax Account, 2) Insurance Premium Account, 3) Debt Service Account, 4) Replacement Reserve Account, 5) Required Repair Account, and 6) Senior Mezzanine Loan Account. The seventh is the Excess Cash Flow Account, which is net operating income less payments into the first six subaccounts. The clearing account arrangement is considered a soft lock box because it does not sweep the

QB\11598655.10

Starwood Controlled Operating Accounts, but instead requires that the Debtors deposit funds into the clearing account. However, once funds are sent to the clearing account they are entirely in the dominion and control of the Mortgage Lenders, subject to the terms of the Mortgage Loan, until they reach the seventh Excess Cash Account. Since the Debtors defaulted in November 2008, they have deposited over $17 million in the clearing accounts. The Debtors believe that the prior servicer swept the Replacement Reserve Account and Required Repair Account in order to pay interest or expense. The Debtors have requested information from the Mortgage Lenders (through LNR) regarding the amounts presently in the Tax Account, Insurance Premium Account, and other accounts. To date the Mortgage Lenders have refused to provide the information.

Although the Mortgage Loan grants the Mortgage Lenders a security interest in the clearing account and the operating accounts used by the Resorts, the Mortgage Lenders apparently did not perfect their security interest in the Starwood Controlled Operating Accounts. The Debtors therefore believe that the Mortgage Lenders' security interests in the Starwood Controlled Operating Accounts used by the Resorts is avoidable under 11 U.S.C. § 544. As of the Petition Date there was approximately $5 million of cash in the operating accounts. As is described in the Cash Management Motion the Debtors are setting up debtor in possession accounts for purposes of segregating unencumbered cash in the Starwood Controlled Operating Accounts as of the Petition Date. Further the Debtors will open separate cash collateral accounts for purposes of segregating accumulated Cash Collateral.

**G.     Use of Cash Collateral and Adequate Protection.**

The Debtors respectfully request that the Court authorize the Debtors and Starwood to use cash collateral for the next 90 days in accordance with the interim budgets attached to the Omnibus Declaration of Doris Parker in Support of First Day Motions (the "Parker Declaration"), the proposed asset managers, as Exhibits "A", "B", and "C". As described in the Parker

-15-

Declaration, the proposed November and December budgets are consistent with the annual Resort budget for calendar year 2010. As Randy Dix testifies in his Declaration, the 2010 budgets were developed by Starwood, MHA, and the Debtors and were affirmed by the Lender under the terms of the Mortgage Loan. The January and February 2011 portions of the proposed budget are derived from the 2011 budget prepared by Starwood. This budget information has not yet been fully analyzed or reviewed by the Debtor or its proposed Asset Manager. The Debtors reserve the right to modify this budget base on its business judgment. The Debtors will consult with the Mortgage Lenders regarding the 2011 operating budgets.

The proposed budgets also include three important capital improvement projects, three of which need to be funded during the next 90-120 days. The Debtors believe that these projects are essential to the ongoing competitiveness of the Resorts, indeed there is a possibility that the Resorts could lose their four-diamond and brand compliance status if these items are not addressed. The projects are as follows:

1. *HVAC Cooling Tower at Hilton Head* The cooling tower at the Hilton Head Resort is failing. Further, the structure on which the tower sits is threatening to collapse and potentially fall through the ceiling into the lobby due to rust. It is therefore essential that the tower be replaced. The Resort has already ordered the replacement chillers and deposited $174,000, representing 50% of the purchase price. The remainder of the purchase price will be due when the towers are delivered in (approximately 120 days after order - estimated to be in January). Approval of this item is essential to the ongoing operation of the Resort. At recent meetings in Hilton Head, South Carolina, the Mortgage Lender's representative approved this expenditure.

2. *LCD Televisions at Hilton Head and La Paloma*. As is discussed at length in the Dix Declaration, the Resorts can document losing approximately $9 million of group business as a result of not having flat screen televisions in all of their guest rooms. The lack of

modern televisions is the single largest complaint at both Resorts. The Resorts are the only two Westin-branded resorts in the world lacking flat screen televisions, and there is a legitimate risk that failure to do so will cause the Resorts to lose their four diamond ratings. The cost of this improvement is relatively modest compared to the benefit and have been incorporated into the December budgets for the Resorts.

    3. *Hallway Carpet at the Hilton Head Resort*. Although the hallway carpets at the Hilton Head Resort are only three years old, the poor quality and installation have caused this carpet to require replacement in order to be consistent with guest expectations for a luxury four diamond resort. At recent meetings in Hilton Head the Mortgage Lenders' representative approved this expenditure at the resort. For cash flow reasons the we have scheduled this expenditure for a March, April or May time frame. It is critical that the work be completed by the middle of May when Hilton Head's busy season kicks off.

The Mortgage Lenders will be adequately protected through a replacement lien in post-petition income and accounts receivable generated by the Resorts to the same extent and priority as pre-petition. The Mortgage Lenders will be adequately protected by the ongoing and future operating profitability, by the post-petition cash management system which will better control Starwood's operating costs, and more transparently segregate cash collateral for specific uses such as tax, insurance, reserve for replacement, and asset and bankruptcy administration. Mortgage Lenders will be further adequately protected by the ongoing and future operating profitability and improved hotel performance resulting from the proposed targeted capital expenditures.

### III. LEGAL AUTHORITY.

Pursuant to 11 U.S.C. § 363(c)(2)(B), a debtor-in-possession may use cash collateral if the party with an interest in the cash collateral authorizes such use, or if the court, after notice and a hearing, authorizes such use. The entity asserting an interest in the cash collateral has the burden

-17-

of proof on issues of the validity, priority, or extent of any claimed interest in the cash collateral. 11 U.S.C. § 363(p). Once proven, the court must condition the use of cash collateral to adequately protect the secured party's interest therein. Adequate protection does not increase the secured party's bundle of rights under state law; rather, a court must tailor the amount or method of adequate protection so as to prevent any diminution in value to the secured creditor's collateral. *See In re Pac. Lifestyle Homes, Inc.*, No. 08-45328 (Bankr. W.D.Wash. March 16, 2009), *available at* 2009 WL 688908, *citing In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 431 (9th Cir. 1984). All the secured party is entitled to is adequate protection of the rights it bargained for. *See id.* Furthermore, if the value of the creditor's rights is not likely "to diminish during the time of use," adequate protection need not be provided. *See In re McCombs Props. VI, Ltd.*, 88 B.R. 261, 266 (Bankr. C.D.Cal. 1988) ("I am not convinced that gross rents will diminish over the foreseeable future and this is the risk requiring protection . . . Debtor has committed to use the cash collateral to pay operating expenses and improve and maintain the Property . . . [and thereby has] substantially eliminated the risk of diminution of [the creditor's] interest in cash collateral.").

## IV. **CONCLUSION.**

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other relief as is just and proper.

RESPECTFULLY SUBMITTED this 17th day of November, 2010.

> QUARLES & BRADY LLP
> One South Church Avenue
> Suite 1700
> Tucson, Arizona 85701-1621
>
>
> By  */s/ Kasey C. Nye*
>     Kasey C. Nye
>     Elizabeth S. Fella
>
> Proposed Attorneys for Debtors

QB\11598655.10